May it please the Court, I'd like to reserve three minutes for rebuttal. All right. Try to keep your own time, but I'll try to help you. Okay. Plaintiff is appealing the District Court's denial of class certification and its orders dismissing the action pursuant to Rule 12b-6. Our case is in the main identical to a case that was coordinated with under a similar docket below the direct purchaser case. That's generally how I'll refer to it. The difference mainly is in the proposed classes we seek to represent, and that direct purchaser case is currently proceeding to trial this year on a claim that we make in our case as well, but was dismissed on a motion to dismiss. The Court denied class certification, dismissed our case on the pleadings, and in doing so committed several reversible errors. The first I'd like to focus on is the iTunes monopolization claim. Again, this is proceeding to trial on a very similar theory, which is that Apple blocked a competitor from selling music that would play on Apple's music players. Our claim alleges the exact same behavior, and the only difference is they allege that there's higher prices resulting for iPods, and we allege that there's higher prices resulting for iTunes. Now, did the direct purchasers ever allege or show that the price for iPods was higher and by how much? No, they didn't, and the reason for that is a very good one. It's not actually a requirement for a monopolization claim. Well, Judge Ware, I think, took the position that you had not alleged an antitrust injury under Section 2 and that the allegations of, I think, the second amended complaint were internally inconsistent on that point. Would you address that? Why was Judge Ware wrong about that? Well, I think he addressed that to the amended complaint, not the second amended complaint. If you look at his analysis in the second decision dismissing our complaint, he doesn't actually say that. And regarding the amended complaint, he misconstrued the allegation. If you look at it, first of all, it was in support of a different claim, and second of all, we didn't take the position. We were quoting something Apple said in support of an iPod overcharge claim, which was a different claim. Tell me then with respect to the monopolization claim. Yes. Why under Section 2 of the Sherman Act you have alleged an antitrust injury on your indirect action? I realize that we're not at the Illinois versus a different point in your presentation, but as to this particular point, the monopolization claim, wherein have you, for example, alleged that there was super competitive pricing that Apple was able to impose? Well, first of all, as a matter of course in antitrust cases, plaintiffs generally allege that super competitive prices resulted, and it's a qualitative, not a quantitative analysis. I agree, but where you have allegations in the complaint that before, forgive me if I got the wrong date, but well before you had this Fair Play imposition that they were charging 99 cents, and all during that period they charged 99 cents, and afterwards, even after Fair Play was eliminated, they were charging 99 cents. So where is the super competitive pricing model that you are relying upon? Well, we don't allege a super competitive pricing claim. We allege a monopolization claim. But you still have to show injury. I get your monopolization claim. Right. Two points there. First of all, as we pointed to in the pharmaceutical cases, where a brand name drug maker blocks competitors, the point is that the consumers suffer injury because they weren't able to purchase from lower priced competitors. They weren't able to purchase from real networks at 50 cents a track instead of 99 cents a track. They could purchase. They couldn't buy music from iTunes. They couldn't get that same thing and have it play on their player. But they could buy music, the same music from other vendors, and play it on their players, could they not? No, but the key difference is that they could buy music that they could play on their iPods. And what we're saying is if people had the opportunity to purchase lower priced music to play on their iPods, they would have, and they would have spent less money. That difference in the price is their injury. But what do we make of the fact that when Apple increased some of its prices, when it began selling music without fair play restrictions? Well, that's not exactly what we allege. We only say that there was an instance in which it charged $1.29 for certain top tracks and that its competitor charged lower prices. And we allege that was part of a three-tiered pricing structure in which in response to competition, Apple actually charged, I think it was 69 cents for some tracks. And so we have several sets of allegations here that, you know, when Amazon came on the market, it priced music at a 10% discount to Apple. And these are just some of the examples. Well, Apple introduced variable pricing in 2009. Some tracks were still 99 cents. Others were $1.29. But in 2009, Apple also began selling most audio downloads without fair play restrictions. I would think that the removal of this restriction would cause prices to go up, not down. Your theory mystifies me. Well, Your Honor, again, I would return to the point that a monopolist might raise prices in response to competition. That's very well established in the Hatch-Waxman drug cases. Some people just will pay more for brand name Lipitor even though they can get a generic at half the price. And that doesn't indicate that what the brand name did in blocking the generic drugs was anti-competitive. There's no dispute about that. And so, you know, we included that allegation regarding the $1.29 tracks for a different reason. But I think the complaint contains many allegations that, you know, when competitors could enter the market, they wanted to compete with Apple on price. Well, if that's true, in 2009 when fair play was eliminated and people could buy and use music from iTunes on other devices, why didn't the price drop then? It should have dropped a lot. There's competition out there. People can use it on any device because you don't have the fair play issue. You know, our iTunes monopolization claim is really just about the fact that they had 100 percent of this market for music that could be played on Apple players, and they blocked any competitor that could sell music that would play on the players. It wasn't about the DRM. It was about whether someone – I thought that was the whole basis of your complaint was that with the DRM, nobody else could use the music on their devices. No, DRM is part of it, but the point is that on the Apple iPod, when real networks came on the market, and this is the issue that's going to trial in the district court. In the direct case? Yes. And the court has denied – a motion to dismiss has certified a class and has denied summary judgment on this. Judge Ware did that before he left the bench, right? Sorry? He certified the class? Yes. On the direct case. Who's handling it now? It's Judge Rogers-Gonzalez – or Gonzalez-Rogers, I'm sorry. I think the key thing to understand here is it is a little complicated, but there's two related markets here. There's the iTunes market and there's – or the downloadable music. Do you agree that in order for you to state a cause of action on the monopolization claim, you have to allege an antitrust injury as defined by the cases, and that if the complaint is internally inconsistent in terms of enabling you to state such an antitrust injury, that the judge was correct in knocking down that claim? I don't see any internal inconsistency. Is there something you'd like to direct me to address? Just a point. For example, that you had the same pricing throughout, with or without the fair play, with or without – what was the other one? DRM or whatever it is. It just seemed to be uniform. There was no super competitive pricing. Wherein does the antitrust injury lie? Right. Well, first of all, I just want to clear up something factually. There's the DRM, but what this iTunes monopolization claim is, is that real networks wanted to come on the market with DRM that would be playable on an Apple device. Right. And that's what we're saying Apple thwarted. Right. No, I understand that. But you also have to show that the consumer – well, the competition was injured as a result. They did come on with their device, right? They did sell. They had other sources of music. I had one. Right. You know, they sold music. They just couldn't get it from iTunes because it wouldn't play. And the injury is just like in any other antitrust injury where a monopolist blocks someone from entering the market, which is they could not purchase a competitor's products for lower prices. And we provided a lot of allegations that competitors wanted to enter this market and charge lower prices. And when they could, they did. Amazon came on the market and charged $0.89. But once the fair play was removed, which was the barrier in this case, nothing like that happened. The prices remained the same for Apple. The other people tried to lower it. It didn't really change much. How then does that constitute an antitrust injury for Section 2 purposes? Your Honor, the prices changed dramatically. There was a 10 percent discount in price. This is a very large market. A 10 percent discount in price is a lot of damages. I understand that. But, I mean, the 10 percent was offered by people other than iTunes, right? Right. And Apple. But they didn't lower their prices. But, again, that's not a requirement to state a monopolization claim. Lots of monopolization cases stand for that proposition. I'd just like to turn to the injunctive relief claim. This injunctive relief claim has been part of the direct purchaser's case since the beginning. In December 2008, the court certified this claim as a B-2 class. And it recognized, quote, plaintiffs seek to enjoin defendant from maintaining its restrictive technology practices in the future and seek to compel defendant to unlock media already purchased from the iTunes music store so it would be played on non-iPod digital media players. My problem, counsel, is seeing why this is an antitrust injury. She just can't play it when she wants to, the way she wants to. But she can play the music. Right. But, again, that's something that this is an injury the district court has recognized is cognizable in the antitrust law and is proceeding to trial. We're up here on appeal arguing that we're entitled to the same regard with respect to the class we seek to represent, which is an injunctive relief class. And the district court also denied this claim on a motion to dismiss in June 2010. And at that point, or soon afterwards, the direct purchasers decided not to pursue an injunctive relief claim. After that ruling, we amended our complaint to allege the same injunctive relief claim, and that's the point at which the court dismissed our claim, even though it had already denied a motion to dismiss the claim, certified a class on the claim, and the whole of the ruling is that mere maintenance, and that was the phrase the court used, of DRM is insufficient to support an antitrust claim. But that isn't what we allege. We allege that Apple took steps after obtaining monopolies to maintain the DRM, even after the time in 2009 when it sold the same tracks without DRM. So in this post-DRM period, it's really difficult to see what the point is of this DRM other than to lock in purchasers, because the same exact music tracks are being sold all over the planet without any restriction. So it only restricts the people who bought it before this. Do you agree that in order to get an injunction, though, you have to show that the underlying claim, the same one you're making in the monopolization claim, has to be unlawful? That's the predicate of getting an injunction, right? Yes. Right. And we allege that these software updates were purposely designed to thwart competition. On the class certification claim, the district court certified the direct purchaser class originally in December 2008, and this was just before Summers moved for class certification. And its analysis, I think it's fair to say, was pretty succinct. I don't think the experts that were used in that case even appear in the decision. And say what you will of it, it probably reflects the fact that as product market go, the iPod market at that time was not that complicated. It was one seller with a variety of different iPods that had different capacities and some different features, but not like the kind of case you see with a very complicated supply chain and different levels of distribution, as we pointed out in our briefing. The court also recertified the class in 2011, and I believe they say something about, well, the court's outlined some viable methodologies, but that's really all it says. But at that point in December 2008, when the commonality and predominance analysis of the opinion was so short, we didn't think that we were going to be asked to put forth a detailed regression analysis or prove what the overcharge was. And I think it's fair to say we were pretty blindsided by the standard the court held us to. We really think the court moved the goalposts on us. And of course we know that this is an abuse of discretion standard, but at the end of the day, if you bought your iPod from an Apple store, you're part of a certified class going to trial. If you bought your iPod from Target or Walmart, you're out of luck, because the court just applied a very different standard to us. All we're asking is to give it a chance to submit whatever supplemental briefing. So you think the district court's Illinois BRIC analysis was wrong? Well, no. I mean, that goes to a different issue. Well, you were talking about Target and so on, other than Apple. Isn't that the indirect purchaser problem? Yes, but we have a claim under California's unfair competition law. But that doesn't do you any good unless you have an underlying claim that's been proved under the antitrust laws, do you? I mean, the UCL is just basically, you did something wrong over there, so we're going to enforce it under California law. Well, about half the states have instituted what are called Illinois BRIC repealer statutes, and basically the way it usually works, and it's reflected in this complaint, is the indirect purchaser alleges an injunctive claim under Section 2 or Section 1, but you don't have standing under Illinois BRIC, and so you bring a claim under the state law as well, and those are the Illinois BRIC repealer statutes. And it's your position that California's UCL contains the repealer? Yes, and if you look at the court's decision denying the motion to dismiss, it sustains the UCL claim on this basis that if you have a violation of Section 2, you also have a violation of the UCL. Okay. Okay, thank you, counsel. We've gone over. I was going to remind you after three minutes, but we'll give you two minutes to respond. Good morning. May it please the Court. The key point here is indeed antitrust injury, which is a distinct substantive element of an antitrust claim. It's not just damages. It's fact of injury or impact, and it must be separately alleged with supporting facts and not mere conclusions, and that's the plaintiff's problem here. This is the Iqbal Twombly problem, right? Yes, which requires that there be factual content pled, and the court said that we're entitled to some degree of specificity in pleading before we proceed on a massive antitrust action, and that's exactly what we have here. And those claims must be plausible under Iqbal and Twombly, right? Correct, and plausible, I should say, is not merely conceivable. It has to be raised above the speculative level. Well, let me just ask, why isn't it a claim that the consumer paid more for audio downloads because of Apple's monopolistic behavior? Why isn't that enough to assert an antitrust injury? Well, Your Honor, it falls into the category of a conclusion without factual content, and most importantly in this case, it's a conclusion that is contradicted by the facts that are alleged in the complaint. As the questioning of my colleague indicated, the theory here is that the introduction of competition from just one competitor, real networks, would have caused Apple to reduce its prices, and that's their theory of the iTunes music overcharge. But we know that just a couple of years later, it wasn't just one, it was completely unrestrained, uninhibited competition from any number of well-financed, very large competitors, including Amazon, as the one alleged in the complaint, came into the market, unimpeded competition, and there was no change in Apple's prices. Now, they say Amazon came in at a 10% discount to Apple's prices, but their theory is that Apple's prices were super competitive, and as purchasers of music from the iTunes store from Apple, they're seeking damages for that super competitive pricing. That's in paragraph 60 and 66 of their second amended complaint. So it's not enough simply to point to another competitor charging somewhat less, that happens in competitive markets. They have to show that there was super competitive pricing, that's their theory, by Apple, and they just simply haven't alleged any facts to support that. And as I say, the facts that they do allege contradict that completely. Now, they rely heavily on the district court's rulings in the direct purchaser case, but that involves iPods and not music. Now, when this plaintiff brought her claim originally, her theory was an iPod overcharge. And in fact, she had an expert report that attested to the fact that her theory was Apple was not overcharging for music. To the contrary, it was using low prices on music to spur sales of iPods. And that's the direct purchaser's theory. That's the theory that they're proceeding on to this day in the district court. The indirect claim is just the opposite, isn't it? That they have diminished the value of the iPod because they can only play the restricted music, is that? Correct. And that's blocked by Illinois BRIC, unless he's correct about the UCL's anti-Illinois BRIC function. Well, it is barred by Illinois BRIC, and the UCL doesn't help them on that because that's a damages claim. Right. And damages aren't recoverable under the UCL. And then in addition, on the diminution in value claim of the iPod, there's other problems with that as well. Perhaps the biggest of which is that their theory is that the iPods purchased, as they say in their complaint in paragraph 56, prior to these upgrades that they're challenging, had functionality that was then lost. So the consumers who purchased before the upgrades suffered a post-purchase diminution in value. That's their theory. Their problem is, this planet purchased in November 2005, which was after the upgrades began. Now she says, oh yes, but there were additional upgrades that came along. But she doesn't allege that those upgrades added anything. They perpetuated the exclusion of real networks and the other DRM, we call them the DRM stripping hacks, the other programs that she alludes to, JHIM and the like in her complaint. There's nothing new from those additional upgrades. So it's just a perpetuation that doesn't add anything to her claim. So for those, both Illinois BRIC and for this problem that she didn't purchase prior to, as her complaint alleges, we think the diminution in value claim has no merit at all. And then back on the iTunes music claim, her other allegation as well, when Reel came in in 2004, it was charging 49 cents a song. But again, she doesn't allege that that was the competitive price. And in fact, her complaint again contradicts that, because we know that when Amazon and the others came in in 2007, 2008, they were charging 89 cents, 99 cents. So I think it was telling, Your Honor, when you asked the question, you know, what reason is there for the price, Apple's price is not dropping in 2008 when we have this uninhibited competition come into the market? And there was no answer to that. And there are no facts alleged in the complaint to answer that question. And that's the fundamental defect on the iTunes music overcharge claim. It just doesn't comply with the requirement that we have factual content, that we have specificity in the pleadings. Let me turn to the injunctive relief claim that counsel has referred to as well. The thing about their injunctive relief claim is they're saying we need this to eliminate the future, the threatened injury, the lingering effects, they call it, of the past conduct. And to do that, the relief they're asking for is removal, no charge to them, even though the record labels will charge Apple for it. They want the removal of the DRM on music that was sold in the past. Now, the district court has ruled that it was lawful, and they don't challenge this ruling, for Apple to encode the music with its own fair play DRM. But now they're asking that all of that be removed. That's one problem they have with the claim. Don't they have to allege an illegal act, an anti-competitive illegal act, in order to get an injunction in this situation? They do. And so one of their problems is that the use of fair play the district court has ruled was legal. Now, his response to that is, yes, but there's still a live claim here with respect to the upgrades that happened later. But here's the problem with that. If I have an iPod that has music on it that has fair play encoded songs that I purchased before the labels dropped the DRM requirement, I am not inhibited by that music on my iPod from purchasing from whomever I would like now. I can buy from Amazon, I can buy from Target, Best Buy, Walmart, any of them. What I have on my iPod has no bearing on where I can buy music now. And they don't allege the contrary. There's no facts. They're not arguing to the contrary, as I understand it, on that one. So it does get to your Honor's point about their alleging, well, we'd just like to be able to freely play it wherever we want. But that's divorced from any anti-competitive harm. Now, the other way in which they suggest that there may be some lingering effect is with respect to iPods. But they've abandoned the iPod overcharge claim. But even more importantly, when we talk about future effect on iPods, counsel referred, well, there's still people who are locked in by this music. But this plaintiff does not allege that she's locked in by purchases she made years ago. There's no allegations whatsoever about the degree that she purchased Fairplay music, how much of it she has, what future purchases she may wish to make. So there's just nothing here that says that this plaintiff has suffered any kind of harm, any kind of injury, even future threatened injury, that would be remedied by the injunctive relief that she seeks. Let me ask you this. This is a strange question, I know, but I just have to deal with this. My recollection is that during this whole period, if I had a CD from somebody, I don't care who, that I could burn that onto my computer and play it through iTunes and download that onto my iPod. Is that correct? Does the record say anything about that? I'm not sure what's in this complaint on that particular subject, but that is correct, Your Honor. Okay. And so what they're focused on, the music that comes downloaded off of the Internet, and it was as to that music that the labels impose this requirement. And it was the labels that imposed the requirements, not Apple itself, right? Correct. And she alleges that, I believe it's in paragraph 37 of her complaint, that that was a requirement of the labels. And that's what happened in 2007-2008, as she alleges. EMI began dropping it, the requirement for DRM, and the others followed. Let me conclude, then, by talking briefly about the class certification issue. And I say only briefly because I don't think the issue was properly before this Court for any of about three different reasons. We filed a motion to dismiss her appeal to the extent it seeks review of that class certification order on the basis that she never pursued that to a final conclusion in the district court, and therefore it's not appealable. Her response to that is, well, the district court rejected it, and therefore she hasn't abandoned it. And she can also, as part of her appeal from that rejection, ask for review of the class certification ruling. The problem with that is, if it's true that, if it were true that the district court rejected that claim, she's abandoned it on appeal, because she doesn't, there's no argument in her brief, no argument we heard this morning, challenging this supposed rejection of an IPOD overcharge claim. If you look at the four issues that she states in her brief, there's no, none of those issues relates at all to an IPOD overcharge claim. Now, we think what actually happened is she abandoned it in the trial court, and the district court did not reject it in the trial court, and so that's an alternative basis for saying that the issue, the IPOD overcharge claim, and therefore the class certification ruling is not properly before the court. But either way, either she abandoned it in the trial court, or she abandoned it here, but under no circumstances is it properly before this court. And then, if any more reason were necessary, if she had a live IPOD overcharge claim, it would, by her own admission here this morning, it would be different from the one that the trial court considered when it ruled back in 2009 on her class certification motion, because that was a motion on a claim, an IPOD overcharge claim, premised on her original theory about the unlawfulness of adopting fair play in the first place, which the district court has since rejected, and which she's not pursuing any longer. So her current IPOD overcharge claim is related to these later updates, and the district court has never considered that issue in this case as to this plaintiff. And the fact that it is ruled on it in the other case with the direct purchasers doesn't help her, because it's different questions, as evidenced by the fact that the district court reached different results when it first came up on the original claim. And then the final point is, if the issue were before the court for all the reasons that we've described in our brief, this was not an abuse of discretion. The court held an evidentiary hearing, considered carefully the showing, or lack thereof, more accurately, by plaintiff and her expert and concluded that, applying the analysis the court is required to apply, the rigorous analysis, she hadn't made a showing proper for class certification. So from your perspective, Twombly and Iqbal is what's fatal to this, basically? Yes, and frankly, Your Honor, even under the more lax standards before Twombly and Iqbal, this complaint would not be enough. Thank you, counsel. Thank you. Regarding the antitrust injury that we've alleged in our iTunes monopolization claim, I'd just like to draw the court's attention to the antitrust injury we allege in our complaint in paragraphs 89 and 90. Apple has harmed competition and innovation by forcing out competitors in the relevant product markets, and it has harmed consumers by causing them to buy Apple downloads and media players when they otherwise would have been able to purchase consumers' products, and we have fulsome allegations. Those are conclusory allegations, are they not, counsel? They're not, because we supplied two or three examples of competitors who were willing to compete with Apple on prices, and it's a bedrock principle of antitrust law that competition is good for prices, good for product quality, good for variety, and good for consumers. It seems to be turning antitrust law on its head for us to have to prove that competition would be good for consumers. We're saying, look, there's three elements of a monopolization claim, and we've satisfied them. We shouldn't have to make a showing of whether the price was super competitive or not. That's not part of monopolization law. Regarding the injunctive relief claim, we do allege that the harm is continuing. If you have DRM-encoded tracks in your iTunes library, the only players that will play them are Apple players, and that's why we're seeking an injunction here. And those upgrades that Apple continued through 2010 and through 2011 when we filed this complaint were still directed towards thwarting removal of this DRM. Does it make any difference that it was the labels that required the DRM? If the labels didn't get the DRM, they wouldn't sell the music to Apple, and nobody would have gotten the music in the first place, right? Right. So how much is your client harmed? Mr. Stewart alluded to paragraph 37 of our amended complaint. What he left out was what we said was, these companies, however, did not require Apple to limit audio downloads to use with only Apple products. It only required Apple to use DRM that would restrict the legal population. The limitation is that because of these, it could only be played on Apple products. Right. But the company required the DRM. That's what created the problem, right? Right, but they didn't require the DRM that Apple used. Apple could have used any DRM. What Apple chose to do was use a DRM that restricted music to its players. There are other DRMs available. And you said that? Yes. Okay. Regarding the preservation claim, I don't know if I have enough time. I have 43 seconds. Other way around. No, you're over 43. Oh, sorry. Well, I don't think we can be faulted for the intervening rulings. Our case has been dismissed since 2009, and so I think supplemental briefing would address whatever has happened in the interim. Thank you, Your Honor. Thank you, counsel. The case is submitted. It will be submitted. The court will stand in recess for the day.
judges: Nelson, Reinhardt, Smith